IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LM INSURANCE CORPORATION, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil Action No. 16-2238 (JBS/KMW) |
| VITALIY KOBYS d/b/a LADA II EXPRESS CO. | **OPINION** |
| Defendant. | |

APPEARANCES:

Jonathan Mark Kuller, Esq.
GOLDBERG SEGALLA LLP
902 Carnegie Center, Suite 100
Princeton, NJ 08540
    Attorney for Plaintiff

Mark Damian Hoerrner, Esq.
BUDD LARNER PC
150 John F. Kennedy Parkway, CN 1000
Short Hills, NJ 07078
    Attorney for Defendant

**SIMANDLE, Chief Judge:**

## I.   INTRODUCTION

Plaintiff LM Insurance Corporation (hereinafter,

"Plaintiff" or "LMIC") initiated this diversity action against

Defendant Vitaliy Kobys d/b/a LADA II Express Co. (hereinafter,

"Defendant" or "LADA II") seeking (1) a declaratory judgment

that Defendant agreed that Plaintiff's premium calculation would

include remuneration Defendant paid to its owner-operators, and

(2) the recovery of a retrospective premium adjustment allegedly

owed by Defendant.   Defendant seeks dismissal of Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6), and Plaintiff has filed a cross-motion for partial summary judgment pursuant to Fed. R. Civ. P. 56.

For the reasons that follow, Defendant's motion to dismiss will be denied, and Plaintiff's cross-motion for partial summary judgment will also be denied.

## II.  BACKGROUND

### A. Factual Background[1]

On June 20, 2011, Defendant submitted an application to the New Jersey Compensation Rating and Inspection Bureau ("CRIB") requesting CRIB to designate an insurance company to provide it with workers' compensation insurance in accordance with the New Jersey Workers' Compensation Insurance Plan ("the New Jersey Plan"). (Compl. at ¶ 12; Ex. B to Compl.)[2]  Defendant could not

---

[1] For purposes of the pending motion, the Court accepts as true the version of events set forth in Plaintiffs' Complaint, documents explicitly relied upon in the Complaint, and matters of public record.  See Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014).  The Third Circuit has explained that "'[d]ocuments that the defendant attaches to the motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002) (internal citation omitted).

[2] The New Jersey Plan "provides involuntary assigned risk coverage to New Jersey employers that cannot obtain coverage in the voluntary market. The risk covered by policies issued through the [Plan] is defined as 'the entire insured operations within the State of New Jersey or to which the New Jersey Compensation Law is applicable.'" Hornet Exp. v. Zurich Am. Ins. Grp., 382 N.J. Super. 408, 410 (App. Div. 2006).

purchase workers' compensation insurance on its own through the voluntary market, so it applied for insurance via the involuntary market through the Plan. In submitting the Plan Application, LADA II agreed with respect to any insurance provided to it by a carrier assigned by CRIB that (1) the provisions of the New Jersey Plan would be applicable, (2) the provisions of the New Jersey Workers Compensation and Employers Liability Manual ("Manual") would be applicable,[3] (3) that it would provide true and correct information, (4) that it would cooperate fully with any assigned carrier, and (5) that it would inform any assigned carrier promptly of any changes in the underwriting information provided. (Id. at ¶ 19.) Defendant also submitted a Truckers Supplemental Application with its main Plan Application, and in response to a question asking to describe its business, Defendant replied, "Trucking company/long haul transportation for hire." (Id. at ¶¶ 20, 23; Pl.'s SMF at ¶ 12.) Furthermore, when asked if it used any owner-operators, Defendant checked "No." (Compl. at ¶ 22.)

---

[3] The New Jersey Plan provides that workers' compensation and employers liability insurance provided under it is subject to the rules, rates, minimum premiums, calculations, and applicable rating plans of the Manual. (Compl. at ¶ 15; Ex. A to Compl.) More specifically, Part 4, Section 1, Page 38 of the Manual provides that "[t]ruckmen engaged in hauling under contract, whether for one or more individuals or concerns, shall under no circumstances be classified and rated except in accordance with the appropriate TRUCKMEN classification. Each classification includes miscellaneous employees such as terminal employees, garagemen, and repairmen." (Pl.'s SMF at ¶ 15.)

Plaintiff alleges that Defendant agreed to the "Hired Vehicle Rule" portion of the Manual when it applied for coverage pursuant to the New Jersey Plan. (Id. at ¶¶ 27, 30.)[4]  As a result, the Hired Vehicle Rule was applicable to insurance applied for and obtained by Defendant through the New Jersey Plan. (Id. at ¶ 28.)  According to the records of the Federal Motor Carrier Safety Administration, Defendant has been a US Department of Transportation ("USDOT") authorized interstate common carrier, USDOT No. 851399, with eight power units and ten drivers. (Id. at ¶ 40.)

Initially, in 2011, CRIB designated other insurers to provide coverage to Defendant under the Plan. (Pl. SMF ¶ 21.) On April 2, 2014, CRIB directed Plaintiff via a Notice of Re-Designation to provide coverage for Defendant effective June 24,

---

[4] The Hired Vehicle Rule states: "If vehicles, including drivers, chauffeurs and helpers are employed under contract and if the owner of such vehicles has not insured its compensation obligation and furnished evidence of such insurance, the actual payroll of the drivers, chauffeurs and helpers shall be included in the payroll of the insured employer at the proper rate for the operations in which the insured employer is engaged. If such payroll cannot be obtained, one-third (1/3) of the total amount paid for the hire of such vehicle under contract shall be considered as the payroll of the drivers, chauffeurs and helpers. If the proprietor or partners who own the vehicles are also drivers, one-third (1/3) of the contract amount for the vehicles operated by such proprietor or partners shall be included in the payroll of the insured employer.  Such amounts shall exclude fuel surcharge costs, in accordance with Interstate Commerce Commission regulations provided the employer's books and records are maintained to show such costs separately and in summary." (Compl. at ¶ 27.)

2014. (Id. at ¶ 34; Ex. F. to Compl.)  Defendant had two
policies with Plaintiff – WC5-33S-364619-014 (the "014 Policy"),
which was effective from June 24, 2014 to June 22, 2015, and
WC5-33S-364619-015 (the "015 Policy"), which was effective from
June 22, 2015 to June 22, 2016. (Id. at ¶¶ 35-37.)  Coverage has
been renewed for the period of June 22, 2016 to June 22, 2017.
(Pl.'s SMF at ¶ 24.)

    The policies described the process for calculating the
workers' compensation insurance premiums due, which involved
multiplying a rate by a "premium basis." (Id. at ¶ 38.)
Plaintiff explains that "premium basis" included payroll "and
all other remuneration paid or payable during the policy period
for the services of . . . [a]ll your officers and employees
engaged in work covered by this policy" and [a]ll other persons
engaged in work that could make us liable under [the workers'
compensation insurance portion] of this policy." (Id.)  The
policies further explained that each contract year, Defendant
would pay estimated premiums in advance for the policies as the
final premium was determined "by using the actual, not the
estimated, premium basis and the proper classifications and
rates that applied to [Defendant]." (Id.)  The policies also
stated that "You will let us examine and audit all your records
that relate to this policy.  These records include ledgers,
journals, registers, vouchers, contracts, tax reports, payroll

and disbursement records, and programs for storing and retrieving data." (Id.)  Relatedly, each policy contained a New Jersey Workers' Compensation Insurance Plan Eligibility endorsement, which provided that Plaintiff could "audit and examine [Defendant's] records and otherwise fully cooperate with [their] attempts to conduct premium audits or inspect the workplaces." (Id. at ¶ 39; Exs. B & C to Kobys Cert.)

On October 2, 2015 and November 24, 2015, Plaintiff conduced an audit of Defendant's 014 Policy, and Plaintiff's audit representative found that Defendant had over $700,000 of Class 7219 Truckmen exposure, yet maintained no workers' compensation coverage in accordance with the provisions of Title 34 of the New Jersey Statutes. (Compl. at ¶ 42.)  Plaintiff calculated the appropriate final premium and tendered a bill to Defendant, but Defendant has "failed and refused" to pay any of the adjusted premium amounts. (Id. at ¶¶ 43-44, 51.)

**B. Procedural History**

Plaintiff filed its Complaint on April 21, 2016. [Docket Item 1.]  Count I requests a declaratory judgment that pursuant to the Application, the New Jersey Plan, the Manual, and the two policies between Plaintiff and Defendant, LADA II agreed to the inclusion in premium base of remuneration paid to various trucking concerns, who did not maintain workers' compensation coverage that complied with New Jersey law. (Id. at ¶¶ 45-47.)

6

Count II is a breach of contract claim based on Defendant's failure to pay premiums. (Id. at ¶¶ 48-51.)  Defendant filed its Motion to Dismiss on July 11, 2016, and attached a forty-four page affidavit of Vitaliy Kobys. [Docket Item 8.][5]  Then, on August 23, 2016, Plaintiff filed its opposition to Defendant's Motion to Dismiss, while also filing a cross-motion for partial summary judgment on Count II. [Docket Item 15.]  Defendant filed opposition to Plaintiff's motion for partial summary judgment on September 13, 2016. [Docket Item 19.]  The Court has considered the papers filed by the parties and rules on the written submissions and without oral argument, pursuant to Rule 78, Fed. R. Civ. P.

---

[5] Plaintiff contends that submission of the Kobys Certification at this stage is improper because it is outside the pleadings and should not be considered by the Court on a motion to dismiss.  The Court cannot properly consider the Kobys Certification at this stage without converting Defendants' motion to dismiss into a motion for summary judgement. See Campbell v. John, No. 12-2750, 2016 WL 2347038, at *3 (D.N.J. May 4, 2016) (declining to consider a certification attached to the defendant's motion to dismiss "because a post-complaint certification is not the sort of document conceived of in the case law"); Marshall v. Keansburg Borough, No. 13-0533, 2013 WL 6095475, at *8 (D.N.J. Nov. 20, 2013) (declining to consider a certification attached to the defendant's motion to dismiss because "it would require a consideration of matters outside the pleadings").  Given that Plaintiff has cross-moved for partial summary judgment on its breach of contract claim, the Court will consider the Kobys Certification in its analysis of that motion, along with the other evidence submitted to the record. See infra Part IV.B.I.

## III. STANDARD OF REVIEW

### A. Motion to Dismiss Standard

Pursuant to Rule 8(a)(2), Fed. R. Civ. P., a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not required, and "the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (citations omitted). While a complaint is not required to contain detailed factual allegations, the plaintiff must provide the "grounds" of his "entitle[ment] to relief", which requires more than mere labels and conclusions. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).

A motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court concludes that the plaintiff failed to set forth fair notice of what the claim is and the grounds upon which it rests. Id. A complaint will survive a motion to dismiss if it contains sufficient factual matter to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009). Although a court must accept as true all factual allegations in a complaint, that tenet is "inapplicable to legal conclusions," and "[a] pleading

8

that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." Id. at 678. The Court must construe the complaint in the light most favorable to the plaintiff. In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010) (quoting Gelman v. State Farm Mut. Auto. Ins. Co., 583 F.3d 187, 190 (3d Cir. 2009)).

In considering a motion to dismiss, the Court only considers "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006).  If matters outside of the pleadings are considered, then the motion is treated as a motion for summary judgment. See Fed. R. Civ. P. 12(d).

### C.   Summary Judgment Standard

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Alabama v. North Carolina, 560 U.S. 330, 344 (2010) (citations and internal quotation marks omitted); see also Fed. R. Civ. P. 56(a).

In evaluating Defendant's motion for summary judgment, the Court must view the material facts in the light most favorable to the non-moving party, Defendant, and make every reasonable inference in that party's favor.  See Scott v. Harris, 550 U.S.

372, 378 (2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir.

2014).  An inference based upon "'speculation or conjecture,'"

however, "'does not create a material factual dispute sufficient

to defeat summary judgment.'"  Halsey, 750 F.3d at 287

(citations omitted).  Rather, the non-moving party must support

each essential element with concrete record evidence.  See

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  "Where

the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party," the Court may grant

summary judgment.  Matsushita Elec. Indus. Co., Ltd. v. Zenith

Radio Corp., 475 U.S. 574, 587 (1986).

## IV.  DISCUSSION

### A. Defendant's Motion to Dismiss

Defendant argues that Plaintiff's Complaint should be

dismissed under Rule 12(b)(6) because its policies do not cover

most of the truckers that Defendants use, as the company is

"really a dispatcher/agent for a group of independent truck

drivers." (Def. Br. at 3.)  More specifically, Defendant claims

that Plaintiff's 2015 audit was "little more than a pretext"

because Defendant received a bill for a premium adjustment of

$261,816 for the 014 policy, which was over 22 times the premium

that Defendant initially paid under the policy. (Id. at 12.)

Plaintiff replies that Defendant "agreed to precisely the

10

treatment that LMIC employed with regard to the remuneration [Defendant] paid to the alleged owner-operators." (Opp'n at 2.)

### 1. Count I (Declaratory Judgment)

Plaintiff first seeks relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. The DJA provides that a court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a) (emphasis added). "The Supreme Court has long held that this confers discretionary, rather than compulsory, jurisdiction upon federal courts." Reifer v. Westport Ins. Corp., 751 F.3d 129, 134 (3d Cir. 2014)(quoting Brillhart v. Excess Ins. Co. of Am., 316 U.S. 491, 494 (1942)). This is in stark contrast to the general rule that "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." Reifer, 751 F.3d at 134 (quoting Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996)). Nonetheless, although the DJA confers on district courts a "unique and substantial discretion," the exercise of that discretion must be "sound and reasoned." Reifer, 751 F.3d at 139. The DJA is commonly invoked by insurance companies "to seek a declaratory judgment on a purely state law matter" in federal court based on diversity subject matter jurisdiction. Id. at 141. In response to such cases, the Third Circuit has previously observed that "[t]he desire of insurance companies and their insureds to receive

declarations in federal court on matters of purely state law has no special call on the federal forum." State Auto Ins. Cos. v. Summy, 234 F.3d 131, 136 (3d Cir. 2000). Consequently, it became common practice for district courts "to decline to exercise jurisdiction over declaratory judgment actions, involving an insurance company, that are solely brought on diversity, and have no federal question or interest." Reifer, 751 F.3d at 142. This principle is especially relevant because the interest of a state "in resolving its own law must not be given short shrift simply because one party or, indeed, both parties, perceive some advantage in the federal forum." Summy, 234 F.3d at 136. Where state law is uncertain or undetermined, the proper relationship between federal and state courts requires district courts to "step back" and be "particularly reluctant" to exercise DJA jurisdiction. Id. at 136. The fact that district courts are limited to predicting—rather than establishing—state law requires "serious consideration" and is "especially important in insurance coverage cases." Id. at 135.

In Reifer, however, the Third Circuit cautioned against "declining jurisdiction per se" in such cases, because a "wholesale, 'revolving door' dismissal of such cases" would evidence neither sound nor reasoned discretion. Id. at 147 (citing Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995) and Bituminous Coal Operators' Assoc., Inc. v. Int'l Union, United

12

Mine Workers of Am., 585 F.2d 586, 596 (3d Cir. 1978))
(additional citations omitted).  Instead, the Third Circuit
instructed district courts to consider a non-exhaustive list of
factors when determining whether to exercise jurisdiction over
such declaratory judgment actions, including:
(1) the likelihood that a federal court declaration will resolve
the uncertainty of obligation which gave rise to the
controversy;
(2) the convenience of the parties;
(3) the public interest in settlement of the uncertainty of
obligation;
(4) the availability and relative convenience of other remedies;
(5) a general policy of restraint when the same issues are
pending in a state court;
(6) avoidance of duplicative litigation;
(7) prevention of the use of the declaratory action as a method
of procedural fencing or as a means to provide another forum in
a race for res judicata; and
(8) (in the insurance context), an inherent conflict of interest
between an insurer's duty to defend in a state court and its
attempt to characterize that suit in federal court as falling
within the scope of a policy exclusion.
Reifer, 751 F.3d at 146.

Based upon the factors enumerated by the Third Circuit, the Court declines to exercise jurisdiction over Plaintiff's declaratory judgment claim.  On one hand, the Court is unaware of any action between the parties pending in state court.  Therefore, there is no concern about duplicative litigation, nor does Plaintiff have a conflict regarding its duty to defend in a state court.  Moreover, a federal declaration would resolve the uncertainty between the parties, and would provide future parties litigating the scope of the New Jersey Plan with guidance as to the applicability of the Hired Vehicle Rule.  There is no indication that Plaintiff is using the declaratory action as a method of procedural fencing.  On the other hand, there are other remedies available, such as compensatory damages and the New Jersey Declaratory Judgment Act, N.J.S.A. 2A:16-52, which allows for substantially similar relief to that provided by the DJA.  Additionally, there is no significant public interest that this case be resolved in federal court.  See 1100 Adams St. Condo. Ass'n v. Mt. Hawley Ins. Co., No. 14-2203, 2014 WL 52855466, at *16 (D.N.J. Oct. 15, 2014).  On balance, the Reifer factors suggest that the Court shall decline to exercise jurisdiction over Count I.

### 2. Count II (Breach of Contract)

Defendant argues for dismissal of Plaintiff's breach of contract claim because Plaintiff mischaracterized Defendant's

truckers as employees, which inflated Defendant's final premium bill.  New Jersey's workers' compensation laws in general are remedial social laws, and "are to be interpreted in a broad and liberal manner so as to bring as many cases as possible within their coverage." Brunell v. Wildwood Crest Police Dep't, 176 N.J. 225, 236 (2003) (citations omitted); see also Klein v. New York Times Co., 317 N.J. Super. 41, 49 (App. Div. 1998) (explaining that the Act is "humane social legislation designed to place the cost of work-connected injury upon the employer who may readily provide for it as an operating expense." (citation omitted).

Defendant argues that Plaintiff fails to state a claim for breach because Plaintiff's Complaint "proffers no support for [Defendant's] position that the independent truckers are 'employees,'" and Defendant's truckers qualify as "independent contractors" as a matter of law in New Jersey under the "right to control" and "relative nature of the work" tests. (Def. Br. at 24, 26.)  As a result, it argues, Plaintiff "was not entitled to any additional workers' compensation premium" beyond what Plaintiff initially estimated. (Id. at 26.)  On the other hand, Plaintiff argues that it sufficiently states a claim for breach of the insurance agreements because it alleges that Defendant failed to pay premiums pursuant to Part 5(C)(2) of the policies. (Opp'n at 16-17; Compl. at ¶ 49.)  Plaintiff explains that it

has presented a plausible claim of relief because it was "in a contractual relationship" with Defendant "predicated on the representations and agreements" of Defendant, so in applying for workers' compensation insurance under the New Jersey Plan, Defendant agreed that the Plan, the Manual and the Hired Vehicle Rule would apply. (Opp'n at 11.)

The Court agrees with Plaintiff that it has stated a plausible breach of contract claim under Rule 12(b)(6), Fed. R. Civ. P., because it has met all elements of a prima facie breach of contract claim.  In New Jersey, a plaintiff must allege four elements to state a claim for breach of contract: (1) a valid contract "containing certain terms," (2) plaintiff "did what the contract required them to do," (3) defendant's breach of the contract, and (4) damages resulting from that breach.  See Globe Motor Co. v. Igdalev, 139 A.3d 57, 64 (N.J. 2016)(citations omitted).[6]  First, Plaintiff has reproduced and attached portions of the insurance policies containing the terms of premium

---

[6] In addition, the basic principles of law governing insurance policies are well-settled in New Jersey.  The goal with an insurance contract, like the goal with any other contract, is to determine the intent of the parties. See Stone v. Royal Ins. Co., 211 N.J. Super. 246, 249 (App. Div. 1986). To determine the intent of the parties, a court must look at the language of the policy. Id.  When an insurance policy "is clear and unambiguous ... the court is bound to enforce the policy as it is written." Royal Ins. Co. v. Rutgers Cas. Ins. Co., 271 N.J. Super. 409, 416 (App. Div. 1994). "It is not the function of the court to make a better contract for the parties than they themselves have seen fit to enter into or to alter it for the benefit of one party and to the detriment of the other." Id.

calculation.  Specifically, Part 5(C) of the insurance policies explain how Plaintiff calculated premiums, stating that the "premium basis includes payroll and all other remuneration paid or payable during the policy period for the services of . . . (2) [a]ll other persons engaged in work that <u>could make</u> us liable under Part One (Workers' Compensation Insurance) of this policy." (emphasis added)(Compl. ¶ 38.)  It is Plaintiff's contention that such a classification is quite broad and would include the Defendant's truckers regardless of whether they are independent contractors.

Furthermore, Plaintiff provided coverage for Defendant between June 24, 2014 and June 22, 2016, conducted an audit, and tendered a bill for premiums (Compl. ¶¶ 35-36, 41-43), Defendant "failed and refused to pay said premiums," (<u>Id.</u> ¶ 44) and Plaintiff suffered damage as result of the alleged breach. (<u>Id.</u> at ¶ 51.)  Defendant's policies explicitly stated how premium would be calculated up front, that the initial premium was "an estimate," and that the "final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy," and "information developed by audit will be used to determine final premium." (Compl. ¶ 38.)

Because New Jersey courts have not examined this specific policy provision regarding premium basis, Plaintiff relies on two out-of-state cases to support its argument that a breach of contract occurs when an insured fails to pay premiums calculated under these types of provisions.  In the first case, Nat'l Fire Ins. Co. v. Beaulieu Co., 140 Conn. App. 571, 59 A.3d 393 (2013), the appellate court affirmed a trial court decision finding that the plaintiff insurance company was entitled to include in its premium recalculation for a roofing company "all persons or entities, whether employees of the defendant or not, for whom the plaintiff may be liable to pay workers' compensation benefits, unless the defendant provides that such coverage was otherwise provided." Id. at 583 (internal quotation marks omitted).  The court further found that even if the workers were independent contractors rather than employees, the insurance company "was entitled to additional premiums for their work with the defendant because they all fit within part five C 2 of the insurance policy in that they engaged in work that could make the plaintiff liable to provide workers' compensation benefits." Id.[7]  In the second case, La. Workers' Comp. Corp. v. N/C Materials, Inc., 858 So. 2d 534 (La. Ct. App. 1st Cir. 2003), in analyzing the exact same language regarding premium

---

[7] The premium language in Beaulieu is the exact same language as the case at bar. See Beaulieu, 140 Conn. App. at 575 n.5.

basis, the court held that whether the truck drivers were employees or independent contractors was "immaterial" because [a]ccording to the plain language of the insurance policy, even if the drivers were independent contractors, [the insured] must report payments to [the insurer]." Id. at 536.  The court added that "[a]ssertions by [the insured] that none of the truck drivers ever filed a claim for workers' compensation coverage is irrelevant" because "[t]he premiums cover potential exposure to liability, not actual claims." Id. at 536-37.  The Court finds these cases persuasive, as the case at bar closely tracks the facts of the two non-New Jersey cases, and it is certainly plausible based on the facts alleged that Defendant agreed to this premium arrangement and has breached that agreement.

Plaintiff argues that it does not need to allege that the owner-operators at issue were employees, but rather, that Defendant could be held liable under the Workers Compensation Insurance part of the policy for the owner-operators at issue, and it has done so, in Paragraph 49 of its Complaint. (Opp'n at 19-20.)  That paragraph lays out the necessary factual support establishing that the truckers at issue could have made Defendant liable for claims brought under their policies. (Id. at 20.)[8]

---

[8] Paragraph 49 of Plaintiff's Complaint states: "The trucking concerns to whom LADA II paid remuneration operated under LADA II's USDOT authorization, without which those trucking concerns

Taking Plaintiff's factual allegations as true, Plaintiff has stated a claim upon which relief can be granted for breach of contract.  The New Jersey Plan provided that "[t]he employer accepts all provisions of the plan and complete responsibility for the statements in the Application Form when he affixes his signature thereto," and the Plan provided that workers' compensation and employer's liability insurance provided under it would be subject to the rules, rates, minimum premium calculations and applicable rating plans of the New Jersey Workers' Compensation and Employer's Liability Insurance Manual. (Ex. A to Compl.) Furthermore, the Plan specifically states that "[t]he employer accepts all of the provisions of the Plan and complete responsibility for the statements in the Application Form when he affixes his signature thereto." (Ex. A to Compl.) Defendant agreed to the audit in the policies (see Compl. ¶ 38), and despite its argument that Plaintiff "automatically designated" the truckers as employees, the Complaint states otherwise. (Compl. ¶¶ 42, 49.)  Whether Defendant is actually bound by the Plan and Manual is a question more suited for summary judgment, see infra Part IV.B.1.  For the purposes of this motion to dismiss, Plaintiff has essentially pled that we it faced potential exposure for Defendant's truckers, and that

_____

could not act as common carriers in interstate commerce. Without engaging the same trucking concerns, LADA II could not have operated."

it was entitled to charge premium for that risk.  The
fundamental concept of insurance centers on the transfer of
risk. U.S. Mineral Products Co. v. Amer. Ins. Co., 348 N.J.
Super. 526, 544 (App. Div. 2002).  Thus, Plaintiff has plausibly
stated a claim for breach of contract.

> ### a. A New Jersey Compensation Court Could Have Jurisdiction for Truckers Not Based in New Jersey

Defendant makes a series of other arguments in favor of
dismissal, which the Court will now address. First, Defendant
argues that Plaintiff's Complaint must be dismissed because a
New Jersey Workers' Compensation Court[9] would not have
jurisdiction over any claim asserted by the "vast bulk" of
Defendant's truckers as they do not live or work in New Jersey,
nor did they receive and sign their Independent Contractor
Agreements in New Jersey. (Def. Br. at 15, 18.)  Plaintiff's
policies with Defendant only cover claims under the Workers
Compensation Law of New Jersey. (Exs. B, C to Kobys Cert.)  As a
result, it argues, even assuming that the truckers were LADA
employees, there would be no coverage for them under Plaintiff's
workers' compensation policies. (Id. at 19.)  Plaintiff,
however, cites Connelly v. Port Authority of New York and New
Jersey, 317 N.J. Super. 315, 320 (App. Div. 1998) to demonstrate

---

[9] The New Jersey Division of Workers' Compensation has "exclusive
original jurisdiction of all claims for workers' compensation
benefits." N.J.S.A. 15-49(a).

the various grounds by which a New Jersey Workers' Compensation
Court could have jurisdiction over a claim involving a trucker.
(Opp'n at 22.)[10]  These include (1) the fact that Defendant is
located in a single state, New Jersey, where it solicits drivers
from its New Jersey location, (2) the assignment of all trips
and loads begin with Defendant from its New Jersey location and
all drivers are paid by Defendant from its New Jersey location,
(3) the drivers make pickups in Newark, NJ and Rahway, NJ, (4)
the drivers make deliveries in the state of New Jersey, (5)
Defendants' Independent Contractor Agreement requires that
owner-operators maintain Workers' Compensation insurance, and
(6) the Agreement also contains a New Jersey Jurisdiction
Clause. (Opp'n at 22.)  At this early stage in the litigation,
the Court declines to dismiss Plaintiff's Complaint on this
ground because it appears that a New Jersey Workers'
Compensation Court could have jurisdiction over potential claims
asserted by some of Defendant's truckers.  Determining this
issue will require further development of the record regarding

---

[10] In Connelly, the court embraced the jurisdictional analysis
articulated in the Larson's Workers' Compensation Law treatise.
317 N.J. Super. at 319. The six bases upon which New Jersey may
apply its Workers' Compensation Act include: (1) the place where
the injury occurred; (2) the place of making the contract; (3)
the place where the employment relation exists or is carried
out; (4) the place where the industry is localized; (5) the
place where the employee resides; or (6) the place whose statute
the parties expressly adopted by contract. Id.  The Connelly
court also explained that "an injury in New Jersey will trigger
jurisdiction in the New Jersey compensation court." Id. at 320.

contacts sufficient to warrant coverage under New Jersey law.
See International Schools Servs., Inc. v. New Jersey Dept. of
Labor and Workforce Dev't, 408 N.J. Super. 198, 216 (App. Div.
2009)  It is evident that Defendant's argument regarding
jurisdiction turns on a factual dispute that would require the
Court to look beyond the face of Plaintiff's complaint and
therefore cannot be resolved on a motion to dismiss.

> **b. Trans American Does Not Preclude Plaintiff's Complaint from Proceeding at this Stage.**

Next, Defendant argues that even with respect to the
truckers based in New Jersey, Plaintiff's Complaint must still
be dismissed because Plaintiff mistakenly shifts the burden onto
Defendant to rebut the presumption that its truckers were
employees. (Def. Br. at 20.)  Defendant relies on Aetna
Insurance Co. v. Trans American Trucking Service, Inc., 261 N.J.
Super. 316 (App. Div. 1993), since it is "almost identical" to
the present matter. (Def. Br. at 23; Reply Br. at 9.)

In Trans American, like in the present action, an insurer
sued a trucking company to recover premiums after an audit led
to an upward adjustment of premiums based on the company's use
of outside truckers in addition to its regular full-time
drivers. 261 N.J. Super. at 321.  The insurer explained that it
adjusted the premium based on the Hired Vehicle Rule found in
the Manual. Id. at 320.  The court affirmed summary judgment in
favor of the trucking company as it "found no authority which

23

elevates the [New Jersey Workers' Compensation] Manual above the legal definition of independent contractor," and therefore held that the insurer could not apply the Manual's Hired Vehicle Rule to charge Trans American premiums for independent contractors. Trans American, 261 N.J. Super. at 328, 330. In addition, the court held that the "manual's hired vehicle rule cannot change the burden of proof and allow an insurer to assume that outside truckers retained under an independent contractor agreement are an insured's 'employees' after it has received evidence of their independent contractor status because of a mere possibility of some future claim of employee status." Id. at 330.

The parties sharply dispute the applicability of Trans American to the instant matter. Defendant claims that Trans American remains "binding precedent" and urges the Court to follow the Trans American holding that the burden of proof with respect to whether an independent driver is an "employee" within the meaning of the Workers' Compensation statute is on the insurer. (Reply Br. at 1-2.) Plaintiff argues that Trans American is "of very dubious precedential value" because it (1) misstates the statutory authority of CRIB, and (2) at the time of the Trans American holding, Trans American's workforce of sole proprietor owner-operators could not possibly have been subject to the Workers' Compensation Act because N.J.S.A. 34:15-36 has since been amended to allow sole proprietors to obtain

workers' compensation coverage. (Opp'n at 14-15.)[11]  Defendant is correct that Trans American remains good law in New Jersey, but Plaintiff is also correct that the New Jersey Legislature has since undercut portions of the opinion.  Particularly, in 2009, the legislature modified Title 34 in 34:15-90.2 regarding the powers and responsibilities of CRIB in 2009. (Opp'n at 12.)[12] First, N.J.S.A. 34:15-90, which describes the makeup of CRIB, now states that CRIB "shall have authority to  . . . (e)stablish and maintain rules, regulations, and premium rates for workers' compensation and employers' liability insurance and equitably adjust the same, as far as practical, to the hazard of individual risks, by inspection by the bureau." N.J.S.A. 34:15-90.1-2.[13]  According to the legislative history, the new statute "revises the membership of CRIB's governing committee, not currently codified in the statutes, to make it more inclusive of all parties involved with the workers' compensation systems,"[14]

---

[11] Plaintiff also points to Re/Max of N.J. v. Wausau Ins. Cos., 744 A.2d 154, 155-56 (N.J. 2000) for the proposition that CRIB's "function . . . is to establish the classification of risks, base rates, system of merit or schedule rating and premiums to be charged based on those risks, N.J.S.A. 34:15-88 and -89."
[12] N.J.S.A. 34:15-90.2 repealed N.J.S.A. 34:15-89 and N.J.S.A. 34:15-90. (Opp'n at 12.)
[13] One treatise describes CRIB as a "quasi-independent, privatized instrumentality of the State of New Jersey created by the legislature and supervised by the Commissioner of Insurance." 38 N.J. Prac., Workers' Compensation Law § 6.1 (3d ed.)
[14] Instead of CRIB member insurance companies choosing all CRIB directors, now, six directors are elected by the insurance companies, three are appointed by the Commissioner of Banking

while it also "clarifies CRIB's authority with respect to its members and its authority." NJ S. Comm. State., S.B. 1917, 6/5/2008.  In Trans American, the Court described CRIB as "appear[ing]" more an arm of the insurance industry or a cooperative agency than a governmental agency." 261 N.J. Super. at 320 n. 4.  While it is not necessarily clear that, as Plaintiff argues, the "Legislature has clearly responded to [Trans American's] derisive observations," N.J.S.A. 34:15-90.1-2 does make clear that CRIB has authority to establish rules related to the Manual, which includes the Hired Vehicle Rule.[15]

More importantly, while the parties dispute the applicability of Trans American, the case at bar is distinguishable from Trans American because Plaintiff here currently disputes the independent contractor status of the operators at issue, whereas in Trans American, the insurer in conceded that the workers were independent contractors. 261 N.J. Super. at 327. Plaintiff is therefore not "assum[ing]" that

---

and Insurance (one must be from a licensed insurance producer, one must be from business and one must be from labor). N.J.S.A. 34:15-90.1

[15] Additionally, Trans American relies on N.J.S.A. 34:15-36 for the proposition that sole proprietors have no workers' compensation obligation to insurance, but that statute has since been amended to allow sole proprietors the opportunity to elect to obtain workers' compensation coverage. (Opp'n at 14-15.) The Court does not find that this amendment makes Trans American of dubious precedential value because the court primarily relied on other grounds in finding that the Hired Vehicle Rule did not apply to the independent contractors.

Defendant's truckers are employees, and has indeed plead facts indicating that the truckers were employees. (See Compl. ¶ 49.) Even if the "burden shifts to [the insurer] to disprove [independent contractor] status" where "an insurer seeks to impose charges despite contracts which show independent contractor status," that does not require dismissal on a 12(b)(6) motion.  Additionally, unlike Trans American, where the existence of the Manual was apparently ambiguous in the employer's application, here, Defendant obtained insurance through the involuntary state-sponsored Plan, which specifically states that Defendants' insurance was subject to the rules, rates, minimum premiums, calculations, and applicable rating plans of the New Jersey Workers' Compensation and Employers Liability Insurance Manual. (Exs. A and B to the Compl.); In Trans American, however, the Court noted that the record did not indicate specifically what the insurer's manual was, or the actual basis and method of calculation of the insurer's claimed rate charges).[16] 261 N.J. Super. at 324.

---

[16] Defendant argues that like in Trans American, "Plaintiff apparently concedes that the independent truckers are not employees because it seeks to charge premium for them based on the 'hired vehicle' rule." (Def. Br. at 26).  This is not the case, as nowhere in Plaintiff's papers or exhibits does it concede that Defendant's truckers are independent contractors. Defendant argues that "[i]f Plaintiff contended that the independent truckers were 'employees,'" it would simply seek additional premium for them, and not need to resort to the 'hired vehicle' rule." However, Plaintiff does seek to charge

Defendant also claims that Trans American controls on the issue of whether the failure to pay premiums for the drivers constituted a breach of the insurance agreement. (Reply Br. at 16.)  Defendant points to language in Trans American stating that the insurance company has "a right to charge premiums" back if an injured claimant is successful in establishing employee status, so Plaintiff's complaint fails to allege a breach of the insurance policies. Trans American, 261 N.J. Super. at 330. This argument is misguided, as it speaks more towards the amount of damages, and not the existence of a cause of action of breach.  The court has already found that Plaintiff has properly plead a prima facie case of breach of contract.  Given the significant factual differences in Trans American and the case at bar, Defendant cannot rely on Trans American in arguing for dismissal under Rule 12(b)(6).

### c. Whether the Truckers Are Independent Contractors or Employees Is a Question That is Too Premature to Decide on the Pleadings

Defendant next argues for dismissal because the truckers at issues are independent contractors.  Given the fact that the financial benefits under the workers' compensation act extend only to employees, N.J.S.A. 34:15-1, the question of whether a LADA II driver is an employee or an independent contractor is

---

additional premium, as the unpaid premiums are the basis of its breach of contract claim.

crucial to the determination of whether the drivers are required to maintain coverage and, in turn, whether insurance carriers may legitimately include the agents in calculating premiums. Kertesz v. Korsh, 296 N.J. Super. 146, 152, (App. Div. 1996). See generally 38 N.J. Prac., Workers' Compensation Law § 5.1 through § 5.9 (3d ed.)

For example, under the Workers' Compensation Act, the term "employee" is given a broad definition and includes "all natural persons ... who perform services for an employer for financial consideration." N.J.S.A. 34:15-36.  It is also clear that the term "employee" is to be liberally construed so as to bring as many persons as possible within the coverage of the Act. Brunei1 v. Wildwood Crest Police Dep't, 176 N.J. 225 (2003); Green v. DeFuria, 19 N.J. 290, 296 (1955).  As a consequence, a variety of working relationships have been held to be covered by the Act, including those not necessarily confined to traditional employment settings. Marcus v. Eastern Agricultural Ass'n, Inc., 58 N.J. Super. 584, 590, (App. Div. 1959), rev'd on dissent, 32 N.J. 460 (1960).

In addressing the employee/independent contractor issue, New Jersey courts have applied two tests; the so-called "control test" and the "relative nature of the work test." Tofani v. Lo Biondo Bros. Motor Express, Inc., 83 N.J. Super. 480, 484-92, (App. Div. 1964); see also Caicco v. Toto Bros., Inc., 62 N.J.

305 (1973).  The "control test" is the older of the two and, in general, is based on the notion that when an individual is an independent contractor, that person carries on a separate business and contracts to do work according to his or her own methods, without being subject to the control of an employer, except as to the results.  When the relation is that of employer and employee, on the other hand, the employer not only retains the right to control <u>what</u> is done but also to direct the <u>manner</u> in which the work is completed. <u>Kertesz v. Korsh</u>, 296 N.J. Super. 146, 152 (App. Div. 1996).  The primary factors to analyze here include "evidence of the right to control, right of termination, furnishing of equipment, and method of payment." <u>Trans American</u>, 261 N.J. Super. at 326-37 (citation omitted).

As for the "relative nature of the work test", not only is it the more modern of the two, it is also believed to be the more realistic test in terms of the objectives of the workers compensation act, <u>Kertesz</u>, 296 N.J. Super. at 154.  A critical focus is the worker's degree of independence and whether his or her work is an integral part of the regular business of someone else. <u>Id.</u>

As noted, under this test, one looks to the extent of the economic dependence of the worker upon the business served, as well as the relationship of the nature of the person's work to the operation of the business as a whole. <u>Re/Max of New Jersey,</u>

Inc. v. Wausau Ins. Cos., 304 N.J. Super. 59, 68 (App. Div. 1997).  Stated differently, the key question is whether the nature of the work done by the individual is an integral part of the regular business of the employer and/or whether the worker is economically dependent on that business.  Kertesz, 296 N.J. Super. at 154.

Defendant argues that the truckers are independent contractors under the "right to control" test because (1) it had no right to hire or fire the truckers, (2) the truckers were paid a fee for the job, not a salary, and (3) Defendant did not deduct any amounts for income tax or social security (Def. Br. at 29.)  Defendant argues that the truckers are independent contractors under the "relative nature of the work" test because Defendant is simply a trucking dispatcher/agent, and it only gets a commission for each job. (Def. Br. at 29-30.)  Therefore, the truckers are not "integral" to Defendant's operation, and the truckers "did not 'substantially depend' on LADA." (Id. at 30.)

On the other hand, Plaintiff argues that "the drivers at issue could not engage in interstate commerce without a USDOT authorization and LADA II was highly dependent on the use of the drivers themselves and their equipment in LADA II's business operations." (Opp'n at 20).  As a result, they argue that the LADA truckers "were not merely clogs (sic) in the wheel of LADA

31

II's trucking business," they were "the wheels on which LADA II depended." (Opp'n at 16.)  The drivers at issue made themselves "substantially dependent" on LADA II "economically, during the period in question." (Opp'n at 20); see also Caicco v. Toto Bros., Inc., 301 A.2d 143, 146 (N.J. 1973).  Plaintiff has sufficiently stated a claim that Defendant's truckers were employees, and the Court will address this fact-specific inquiry further in Part IV.B.1.

### d. Plaintiff Has Stated Sufficient Facts Indicating that the Hired Vehicle Rule Applies to Defendant's Truckers

As explained earlier, the Hired Vehicle Rule allows insurance carriers like Plaintiff writing workers' compensation policies in New Jersey to charge premiums for vehicles under hire to an employer at a rate of one-third of the total amount paid for the hire of such vehicle.  Here, the specific amount of premium for the truckers was calculated based on the Hired Vehicle Rule found in the Manual.  Defendant argues that Plaintiff inappropriately relies on the Hired Vehicle Rule because that rule does not apply to sole proprietors such as these truckers, as the rule only applies to vehicle owners that have an "obligation" to purchase workers compensation insurance, which does not include sole proprietors. (Def. Br at 32-33.) And to the extent the Hired Vehicle Rule does apply, Defendant argues that it was satisfied during the 2015-2016 policy period

by the truckers obtaining "occupational accident insurance," which Defendant made available to Plaintiff during the auditing process. (Def Br. at 34-35.)  Defendant again relies on Trans American, 261 N.J. Super at 331-32, in arguing that sole proprietors are not required to purchase workers' compensation.

Plaintiff responds that the occupational policies do not satisfy the Workers' Compensation obligation of the owner-operators. (Opp'n at 22.) It cites to CRIB Advisory Bulletin 10A, which states that "any 'alternative coverage' including any 'Occupational Accident Coverage,' which is not prohibited in New Jersey, is neither a replacement for, nor the statutory equivalent of the Standard Workers Compensation and Employers Liability Policy." (Opp'n at 22-23.)[17]  Moreover, some truckers had coverage by May 2016, but the Complaint was filed on April 21, 2016. (Opp'n at 23.)  Defendant does not aver that it purchased workers' compensation insurance for these workers, and the fact that Defendant bought Occupational Accident Coverage for the truckers does not necessarily equate with the purchase

_____

[17] Interpretive bulletins do not rise to the level of a regulation and do not have the effect of law, so a court is not required to give effect to an administrative interpretation. Brooks v. Village of Ridgefield Park, 185 F.3d 130, 135 (3d Cir. 1999) (citing Batterton v. Francis, 432 U.S. 416, 425 n.9 (1977)).  Instead, the level of deference given to an interpretive bulletin is governed by the bulletin's persuasiveness. Reich v. Gateway Press, Inc., 13 F.3d 685, 699 n.17 (3d Cir. 1994).

of workers' compensation insurance.  The Court declines to dismiss Plaintiff's Complaint on this ground also.

Plaintiff therefore states a plausible claim under Rule 12(b)(6), and its motion to dismiss will be denied.

**B. LMIC's Motion for Partial Summary Judgment on Count II**

Plaintiff also cross-moves for partial summary judgment on the breach of contract claim against Defendant, and the motion relies heavily on many of the same points asserted in Plaintiff's opposition to Defendant's Motion to Dismiss.  This Court may only grant summary judgment regarding the interpretation of a contract, such as the insurance policies at issue here, if "the contract is so clear that it can be read only one way." PaineWebber Inc. v. Hoffman, 984 F.2d 1372, 1378 (3d Cir. 1990)(quoting Tigg Corp. v. Dow Corning Corp., 822 F.3d 358, 361 (3d Cir. 1987)).  For the following reasons, because Defendant is entitled to all inferences in its favor in the context of Plaintiff's cross-motion for partial summary judgment, Court denies the motion.

**1. Breach of Contract (Count II)**

**a. The Role of the Plan and Manual**

Plaintiff first argues for summary judgment on its breach of contract claim because Defendant agreed to be bound by the Plan and Manual when it initially applied for workers' compensation insurance in 2011.  Defendant responds that

Plaintiff has failed to establish that either the Plan or the
Manual is binding on Defendant, as it points to language in the
Plan indicating that the Plan has "no role" once CRIB has
assigned coverage for an employer to an insurer. (Reply Br. at
23; Ex. A to Pl. MSJ Br.)  On the other hand, Plaintiff points
to language from <u>Hornet Exp. v. Zurich American Ins. Grp.</u>, 382
N.J. Super 408, 411 (App. Div. 2006), where the court examined a
similar policy and explained that pursuant to the Plan, the
policy the insurer issued to the employer "was required to
contain the specific policy provisions set forth in the
[Manual]."  Plaintiff argues that the Court should grant it
summary judgment because it calculated the Defendant's premiums
and "faithfully following the provisions of the New Jersey
Manual and the policies – whose provisions are also mandated by
CRIB." (Pl.'s MSJ Br. at 5.)

Defendant claims that the Plan encompasses only Section 14
of Part Three to the Manual, when the part of the Manual that
Plaintiff seeks to impose on Defendant, the Hired Vehicle Rule,
is not part of the Plan; rather it is contained in another
portion of the Manual (Part Three, Section 3, ¶ 46). (Reply Br.
at 23.)  It claims that there is simply no evidence it ever
agreed to be bound by the Plan or the Manual in any fashion.
(<u>Id.</u> at 24.)

There is sufficient evidence into the record indicating that Defendant did not agree to abide by the Plan and the Manual, thereby precluding summary judgment.  First, Defendant applied to CRIB for coverage pursuant to the Plan on June 20, 2011 (Griffith Cert. ¶ 13), but Plaintiff did not begin to provide coverage for Defendant until June 24, 2014, over three years later. (Id. at ¶ 26.)  Defendant explains that he "did not understand that some of the common terms used in the [2011 Plan] application had a technical meaning in the manual," so he did not feel the need to correct the language that his insurance broker used when filling it out. (Supp. Kobys. Cert. ¶ 5.)  Additionally, Plaintiff never contacted Defendant "to ensure that the information on the application or its supplement remained accurate in 2014 when it underwrote" the policies. (Id. ¶ 6.)

Even more importantly, Plaintiff presents no evidence that it provided Defendant with copies of the Plan and Manual nor that Defendant was aware of the policy provisions supposedly binding Defendant to all terms in the entire Plan and Manual. The only reference to the Manual in Defendant's actual policies was in the Premium section, where it stated "[t]he premium for this policy will be determined by our Manuals of Rules, Classifications, Rates and Rating Plans." (Ex. F. to Griffith Cert.)  There is no mention of the Plan or the Hired Vehicle

36

Rule anywhere in Defendant's policies.  Even if Defendant was
bound by the Plan, Defendant would have to probe deeply into the
fine print for the clause stating insurance provided under the
Plan is subject to the Manual, a 371-page document. (Ex. A. to
Griffith Cert.)  The Court therefore finds that there is a
question of material fact as to what terms of the Plan and
Manual are incorporated in Defendants' policies as well as
whether Defendant agreed to be bound by the Plan or the Manual.
Thus, summary judgment is inappropriate.  To hold otherwise
given the current record would not comport with New Jersey law
embracing reasonable expectations of the insured. See Zacarias
v. Allstate Ins. Co., 775 A.2d 1262, 1264 (N.J. 2001)(explaining
that insurance policies are contracts of adhesion and "are
subject to special rules of interpretation").

   **b. Classification of Defendant's Truckers**

   The parties dispute the degree of control that Plaintiff
exercised over Defendant's truckers, and Defendant argues that
Plaintiff's cross motion for partial summary judgment should be
denied because the truckers at issue do not meet the New Jersey
common law tests for employees.  Plaintiff's rationale for
including the drivers' payroll and remuneration in its
calculation of the premiums is that the drivers were legally
considered to be employees of Defendant, while Defendant
considers the drivers to be independent contractors because LADA

37

had no right to hire or fire the workers under the control test. (Reply Br. at 27.)  Viewing the evidence in the light most favorable to Defendant as the nonmoving party, the Court concludes that there exists a genuine issue of material fact as to the classification of the Defendant truckers. See Rong Chen v. Century Buffet and Restaurant, No. 09-1687, 2012 WL 113539 (D.N.J. Jan. 12, 2012) (denying summary judgment where there existed a genuine issue of material fact as to the amount of control exercised over putative employee); cf. id. at *3 ("Because of the fact-intensive nature of the inquiry, an employer determination can rarely be made on summary judgment.")

Plaintiff relies on Tofani v. LoBiondo Brothers Motor Express, Inc., 83 N.J. Super. 480 (App Div. 1964), aff'd, 43 N.J. 494 (1964) to support its claim that the truckers here are employees. In Tofani, the Plaintiff was an owner-operator and leased his tractor to Defendant.  The Court found that Plaintiff was an employee under both the "control" and "relative nature of the work" tests because (1) Plaintiff leased the use of his tractor to Defendant, (2) he personally undertook the sole operation of that tractor on a regular and continuing basis, "thereby becoming a working cog in the conduct" of Defendant's regular business, (3) he was economically dependent on Defendant and not conducting a separate and independent business, and (4) his work constituted an integral part of the regular and

38

continuous functioning of the Defendant's trucking enterprise. Id. at 493.  Plaintiff attempts to equate the situation in Tofani with the facts here, since 20 of Defendant's owner/operators did the "vast bulk" of LADA II's work, and the owner/operators "leased their tractors and themselves" to Defendant.[18]

But Defendant submits evidence in the record that the truckers are not economically dependent on LADA because the truckers "choose to use [Defendant's] back office functions in order to make their lives easier," as a trucker "can obtain loads on his own, but it can be time consuming to find a load at a good time and a good price." (Reply Br. at 30; Supp. Kobys Cert. at ¶ 11.)[19]  Defendant also submits evidence in the record

---

[18] Plaintiff also submits its auditor's letter to Defendant explaining that the owner-operators are not independent contractors so the Hired Vehicle Rule applies. (Ex. J. to Griffith Cert).  The auditor explains that Defendants operations "are not consistent with a trucking broker because owner-drivers are hauling under LADA II Express Co.'s authority . . . A broker should be an independent intermediary involved in the business transactions only." (Id.)

[19] Plaintiff relies on Re/Max of New Jersey, Inc. v. Wausau Insurance Cos., 304 N.J. Super 59, 68 (1997), where the trial court found that real estate agents were employees under the "relative nature of the work" test.  The court heavily relied on the fact that the "agents work for the [broker] office exclusively." Id. (emphasis added).  The New Jersey Supreme Court later affirmed the trial court's holding, and added that determination of whether a real estate sales agent is an employee or an independent contractor is regulated by licensing statutes. Re/Max v. Wausau Ins. Cos., 744 A.2d 154, 157 (N.J. 2000). Here, there is no evidence of owner-operators working exclusively for Defendant, nor is there an analogous statute that regulates the classification of owner-operators.

suggesting that Plaintiff is not merely seeking to charge premiums for drivers earning significant income from the work obtained through Defendant, but that Plaintiff is seeking to charge premium "for <u>all</u> drivers, some of whom carried as little as one load and earned only $2,000." (emphasis added)(Def. MSJ Br. at 32; Supp. Kobys Cert., Ex. C.)  There is also evidence suggesting that the truckers held themselves out as separate trucking companies and were free to accept loads from any other source. (Original Kobys Cert. at Ex. A, ¶¶ 1, 4a.)[20]  Defendant insists that it was truthful when it disclosed on its initial Plan application that it had one truck and one driver. (Supp. Kobys Cert. ¶ 8.)  Seven of the fifteen inspections were for the truck that Defendant owns and disclosed on its insurance application. (<u>Id.</u> at ¶ 9; Griffith Opp'n Cert. Ex. F.)  Further, Defendant presents evidence that just five truckers used its MC number over a two-year period, whereas thirty-two truckers used

---

[20] Defendant also argues that Plaintiff is not entitled to premium with respect to its out-of-state truckers because any claim by those truckers would either be filed in another state, or a New Jersey Compensation Court would lack jurisdiction to hear their claim. (Reply Br. at 32.)  Defendant submits evidence that only 4 of 37 truckers between 2014 and 2016 were incorporated in New Jersey, and the out-of-state claim endorsement in Defendant's policy is only triggered if the worker was primarily employed in New Jersey and was only in the other state on a "temporary" basis. (Original Kobys Cert. ¶ 9, Ex. D.)  As a result, the Court cannot grant Plaintiff's cross-motion for summary judgment at this juncture as factual disputes remain regarding what truckers would be covered under Defendant's policies.

their own MC number. (Supp. Kobys Cert. ¶ 10.)  Discovery would clarify these factual disputes, so the Court declines to grant Plaintiff's pre-discovery motion for summary judgment.

Finally, the parties dispute what regulatory scheme applies to determine whether owner-operators are deemed employees. Plaintiff proposes that the Court adopt regulations from the Federal Motor Carrier Safety Administration, where the term "employee" is broadly defined to include "a driver of a commercial vehicle (including an independent contractor while in the course of operating a commercial motor vehicle." (Pl. MSJ Br. at 12) (citing 49 C.F.R. § 390.5)).  On the other hand, Defendant argues that other New Jersey state statutes are more specific and more applicable to define coverage under the New Jersey scheme than federal regulations; for instance, the New Jersey Unemployment Compensation law provides that "employment" shall not include

> Services performed by operators of motor vehicles . . . who own their equipment or who lease or finance the purchase of their equipment through an entity which is not owned or controlled directly or indirectly by the entity for which the services were performed and who were compensated by receiving a percentage of the gross revenue generated by the transportation move or by a schedule of payment based on the distance and weight of the transportation move.

N.J.S.A. § 43:21-19(i)(7)(X).  Defendant argues that this exception applies to the truckers who own their own vehicles and are paid a percentage of the gross revenue generated by each load. (Original Kobys Cert. at ¶¶ 2, 5-7, 9.)  While both the

41

FMSCA and unemployment compensation law definitions of "employee" are persuasive, the Court will rely on New Jersey statutory and common law regarding workers' compensation, as described supra, in determining the definition of "employee" for workers' compensation purposes in New Jersey.

The Court denies partial summary judgment at this early stage in the litigation. There is a genuine dispute of material fact on the issue of whether the LADA II truckers are in fact employees or independent contractors, and this determination appears to differ among each independent trucker. As a result, Plaintiff's calculation of the post-audit retrospective premium adjustment, the amount allegedly owed by Defendant to Plaintiff, depends upon the determination of fact questions. For these reasons, Plaintiff's cross-motion for partial summary judgment is denied.

**V.   CONCLUSION**

In sum, the Court denies Defendant's motion to dismiss Plaintiff's Complaint, and denies Plaintiff's cross-motion for partial summary judgment on Count II.

**March 20, 2017**                              **s/ Jerome B. Simandle**
Date                                            JEROME B. SIMANDLE
                                                Chief U.S. District Judge